UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA            Crim. No.3:02cr60(JCH)

v.

NATHAN SNAPE                        October 25, 2005

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

_____    On March 21, 2005, the United States Court of Appeals for the Second Circuit ordered a limited remand in this case in light of the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005), and the Court of Appeals' decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).  On March 22, 2005, in light of the remand order, the Government filed a motion with the Court seeking, inter alia, an order requesting the filing of sentencing memoranda to address whether a nontrivially different sentence should be imposed in the wake of Booker and Crosby.  The Court has issued such an order and asked the parties to file sentencing memoranda on the issue. This memorandum is filed in response to that order.  As discussed more fully below, because a nontrivially different sentence should not be imposed in this case, re-sentencing is not appropriate.

## I.    PROCEDURAL AND FACTUAL BACKGROUND

On September 19, 2001, Deputy United States Marshal Laurence Bobnick was contacted by officers with the Connecticut Board of Parole to aid in the location of a fugitive named Nathan Snape, the defendant in this case.  The Board of Parole had an arrest warrant for the defendant.  On September 21, 2001, the officers went to the Greene Homes housing project in Bridgeport to look for the defendant.  Specifically, they went to Apartment 334 of Building 3 at 68 Highland Avenue. When they arrived at the apartment, they found one adult named Najja Fagan sleeping in a back

1

bedroom and two children: a four-year old child named Jaheesha Williams and an infant named Na-Sheay Snape.

The officers conducted additional investigation, which included talking with a confidential informant and reviewing records kept by the Bridgeport Housing Authority. Deputy Bobnick learned that the lessee of the apartment was Janetta Williams and that she lived there with her two children: Jaheesha Williams and Na-Sheay Snape. He applied for and received a fugitive search warrant for apartment 334 and executed it with other law enforcement officers on October 1, 2001.

The officers arrived at the apartment at approximately 6:00 a.m. on October 1, 2001, knocked on the front door of the apartment and announced themselves, breached the door after waiting a reasonable amount of time with no response, and entered the apartment. When they entered, they immediately saw a man and a woman lying on a mattress on the floor of a bedroom toward the rear of the apartment, but in direct view of the front door. Deputy Bobnick and Parole Officer William Griffin handcuffed these two individuals and attempted to ascertain their identities while Deputy James Masterson and Parole Officers Stephen O'Connor and Dan Barry conducted a security sweep of the apartment for other individuals.

At first, the defendant indicated that his last name was Giles, and Ms. Williams agreed. Deputy Bobnick had never before met the defendant, but had a picture of the "Nathan Snape" for whom they were searching. At that point, Officer Griffin took the defendant out of the apartment to talk with him further, and Deputy Bobnick remained with Ms. Williams.

Officers O'Connor and Barry checked the first bedroom, where the defendant and Williams had been sleeping, and found no one else there. They then turned down the hallway toward the second bedroom. As they approached the second bedroom, they noticed what appeared to be a gun

2

sitting at eye level on a shelf in the hallway. Without stopping, the officers conducted a protective sweep in the second bedroom and found no one. At that point, Officer O'Connor returned to the gun, removed it from the shelf, along with a magazine that was sitting next to it. He turned over the gun and magazine to Deputy Bobnick, who identified the gun as a Colt, Delta Elite, 10 millimeter, semi-automatic handgun, and the ammunition in the magazine as eight 10 millimeter bullets. The ammunition was later identified more specifically as eight 10 millimeter, hollow-point rounds manufactured by the Poongson Metal Manufacturing Company in Korea. A subsequent fingerprint analysis of the gun and ammunition revealed no identifiable latent prints.

When Officer Griffin took the defendant outside the apartment and into the hallway, they were approached by Najja Fagan, the same individual who had been in the apartment on September 21. Mr. Fagan was subjected to a patdown search and found to be in possession of a cigar tube containing several small baggies of suspected crack cocaine. He was detained and arrested by Bridgeport police officers.

Meanwhile, Deputy Bobnick and other law enforcement officers began searching the apartment for other identifying items connecting the defendant to the residence or indicating a possible location of the defendant. At this point, the officers were still not certain that the male individual with Officer Griffin was indeed the subject of the search warrant. In a freestanding metal cabinet in the kitchen, Deputy Bobnick located a green cigar tube, similar to the one removed from Mr. Fagan, containing approximately 26 small ziplock baggies with suspected crack cocaine. The substance inside the cigar tube subsequently lab tested positive for the presence of cocaine base.

At that point, Deputy Bobnick confronted Ms. Williams, who was still seated in the living room area. She admitted that the male who was outside talking with Officer Griffin was, in fact,

3

Nathan Snape.  By this time, approximately fifteen to twenty minutes had passed since the original entry.  The officers left the residence, escorted the defendant to Officer Griffin's vehicle and transported him to the Bridgeport Correctional Center, where he was charged with various parole violations.  The paperwork that was provided to the defendant gave him the opportunity to request a lawyer, but he chose not to do so.

On October 9, 2001, Deputy Bobnick and Special Agent Chad Campanell with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") had the defendant brought to the federal courthouse from the jail to conduct an interview.  The agents wanted to talk to the defendant about suspected, ongoing narcotics activity in the Greene Homes housing project and, specifically, about the possibility that additional firearms and narcotics were being stored in the vicinity of Ms. Williams's apartment.  They did not tell the defendant prior to October 9 that they would be speaking to him on that date.   The interview itself lasted approximately thirty-five minutes.

At that start of the interview, the agents identified themselves, confirmed that the defendant was willing to talk to them, and read him his Miranda warnings.  The defendant listened to the warnings and then read and signed a written Miranda waiver form provided by Special Agent Campanell.

The agents then began discussing the drug dealing activity in Greene Homes.  The defendant stated that he had been involved with a group of individuals who had been dealing drugs there.  In discussing his relationship with these individuals, the defendant specifically admitted to dealing drugs with them.  He identified other members of the group by either their street names or first names: Chef, Sose, Buck, Big Mike and Najja.  As to firearms, the defendant indicated that his group had been arguing with a rival group of drug dealers and, as a result, had felt the need to arm

4

themselves. According to the defendant, at all times, at least one member of the group was armed; indeed, they passed around several firearms among them for the express purpose of protecting themselves against this rival group. He provided possible locations of apartments used to stash their guns and admitted that his apartment was sometimes used to hide the Colt firearm that had been discovered there on October 1. He further admitted that, although he did not own the Colt firearm, he had handled it, brought it with him while dealing drugs, allowed it to be stored in Ms. Williams's apartment and, during the weekend prior to October 1, had placed the gun on the hallway shelf, removed its magazine and locked its slide to the rear position, which was exactly how the officers had found the gun during the protective sweep. The defendant also expressed concern about having kept the gun in the apartment because he had not wanted to get Ms. Williams "in trouble" and did not want to jeopardize the safety of her two small children. In fact, he explained that he had taken the magazine out of the gun and secured it on the hallway shelf to keep it away from the children in the apartment.

Also on October 9, 2001, Deputy Bobnick and Special Agent Campanell interviewed Janetta Williams in her apartment in Greene Homes. Ms. Williams provided the agents with an oral statement and then agreed to sign a written statement prepared by Deputy Bobnick. Although Deputy Bobnick was able to locate and speak with Ms. Williams in early 2002, he was unable to find her prior to the defendant's December 2002 trial. According to family members who live in Bridgeport, Ms. Williams was employed as a traveling salesperson and, as of the beginning of December 2002, was in Oregon. Deputy Bobnick was unable to discover an address or phone number for her, but did not think that her absence from Connecticut was related, in any way, to this case.

On September 11, 2002, at approximately 2:29 p.m., during the pendency of this case, the defendant placed a phone call from a Connecticut prison facility. All state inmates are informed orally and in writing that their telephone calls are recorded. During the call, the defendant indicated, inter alia:

> I got to get out of this jail man. I got like, I got three months I owe in January. I got till January to finish this case. I'm trying to get out man. Then I'm done, I'm done man. I'm done . . . it's over. I'll get a job somewhere, I'm done man.

On March 6, 2002, a federal grand jury returned a one-count indictment charging the defendant with unlawful possession of ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On December 17, 2002, a trial jury found the defendant guilty of the offense charged.

At sentencing on April 2, 2003, the Court concluded that the defendant's base offense level was 24 by virtue of his two prior felony convictions for either a crime of violence or controlled substance offense under U.S.S.G. § 2K2.1(a)(2). In addition, the Court applied a four level enhancement under U.S.S.G. § 2K2.1(b)(5) based on the fact that the defendant had admitted that he had possessed the firearm and ammunition at issue in connection with his drug dealing activities. The defendant argued that, despite being convicted after trial, he should receive a two-level reduction for acceptance of responsibility, but the Court rejected that argument.[1] Finally, the Court concluded that the defendant had accumulated 19 criminal history points and, as a result, placed him in Criminal History Category VI, so that the resulting guideline range was 140-175 months'

---

[1]At sentencing, the parties and the Court recognized that, even if the Court reduced the guideline range by two levels for acceptance of responsibility, the effective range would still be 120 months' incarceration. In response to an inquiry by defense counsel, the Court assured the defendant that its ruling on the acceptance of responsibility issue would not affect its consideration of the various requests for a downward departure.

incarceration and the effective guideline range was the 120 month statutory maximum sentence under 18 U.S.C. § 924(a)(2).

The defendant moved for a downward departure under U.S.S.G. §§ 5K2.0 (combination of factors) and 4A1.3 (overstatement of criminal history). The Court refused to depart under § 4A1.3, but agreed to depart under § 5K2.0. In so departing, the Court relied primarily on the circumstances of the defendant's childhood and his resulting emotional condition, as discussed in United States v. Rivera, 192 F.3d 81 (2d Cir. 1999). The court imposed a sentence of 84 months' incarceration.[2]

On April 4, 2003, the defendant filed a timely notice of appeal. He raised three issues: first, he claimed that this Court erred in refusing to suppress the defendant's October 9, 2001 statements; second, he claimed that this Court erred in concluding that the search warrant authorizing entry into Apartment 334 was supported by probable cause; and third, he claimed that the Court's application of a four level enhancement for possession of ammunition in connection with another felony offense under U.S.S.G. § 2K2.1(b)(5), and attribution of 19 criminal history points under U.S.S.G. § 4A1.1, violated his Sixth Amendment rights.

On December 1, 2004, the Second Circuit issued a summary order which rejected the defendant's first two claims on their merits. As to the Sixth Amendment claim, the Court rejected it under United States v. Mincey, 380 F.3d 102, 105-06 (2d Cir. 2004), but withheld the mandate pending the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738. On March 21, 2005, the Second Circuit ordered a limited remand in light of the decision in Booker and its subsequent decision in Crosby. This Court then requested briefing on the threshold question of

_____

[2]Although the Court did not indicate a specific number of levels it was departing from the defendant's adjusted offense level of 28, a six level departure would have been necessary to reach a guideline range which encompassed the 84 month sentence.

whether a nontrivially different sentence should have been imposed had the Court understood sentencing law as subsequently explained by the Supreme Court in Booker.

II.    **DISCUSSION**

    A.    **Sentencing in the Wake of Booker**

In United States v. Booker, 125 S. Ct. 738, the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). See Booker, 125 S. Ct. at 755. The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. See id. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." Booker, 125 S. Ct. at 757. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to appellate review for "reasonableness." Id. at 766.

The Court of Appeals for the Second Circuit has offered some initial guidance to sentencing courts on how to proceed with sentencings in the wake of Booker. In Crosby, the Court summarized the impact of Booker as follows:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either

8

a Guidelines sentence or a non-Guidelines sentence.

Id., 397 F.3d at 113 (emphasis added).

In other words, a sentencing now involves two analytic stages: first, a determination of the applicable Guideline range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in § 3553(a), there is any reason to impose a non-Guidelines sentence.

As to Stage One, the applicable Guideline range "is normally to be determined in the same manner as before Booker/Fanfan." Crosby, 397 F.3d at 112. In limited circumstances, "precise calculation of the applicable Guidelines range may not be necessary" when a judge determines that either of two (not necessarily overlapping) ranges applies, and if "the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies." Id. Such may be true in cases involving "complicated matters, for example, determination of monetary loss," or "close questions . . . as to the precise meaning or application of a policy statement authorizing a departure." Id. In general, however, Stage One requires the Court to engage in the familiar process of making factual findings by a preponderance of the evidence, and interpreting and applying the Guidelines to those facts in order to ascertain the appropriate sentencing guidelines range. See id.

As to Stage Two, the judge must consider the guidelines in conjunction with the other factors enumerated in § 3553(a), in order to determine whether there is any reason to deviate from the guideline range indicated in Stage One. These factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense,

to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.  See Crosby, 397 F.3d at 112-113; 18 U.S.C. § 3553(a).

Because the Guidelines reflect the Sentencing Commission's considered judgment about all of the factors set forth in § 3553(a), the Supreme Court and the Second Circuit have made it clear that the Guidelines continue to play a central role in a sentencing court's § 3553(a) calculus.  Writing for the remedial majority in Booker, Justice Breyer explained that sentencing courts, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  Booker, 125 S. Ct. at 767.  As the Court of Appeals has pointed out, "the excision of the mandatory aspect of the Guidelines does not mean that the Guidelines have been discarded." Crosby, 397 F.3d at 111.

> [I] is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after *Booker/Fanfan*, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum. On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to "consider" the Guidelines and all of the other factors listed in section 3553(a). We have every confidence that the judges of this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice. In short, there need be no "fear of judging."

Id. at 113-114.

10

In the vast majority of cases, a sentence within the advisory guideline range will be the most effective way of promoting uniform, fair sentencing throughout the nation in compliance with § 3553(a). This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in <u>Booker</u> recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. <u>See, e.g.</u>, <u>Booker</u>, 397 F.3d at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); <u>id.</u> at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the <u>real conduct</u> that underlies the crime of conviction."); <u>id.</u> at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); <u>id.</u> at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity."). <u>See also</u> <u>United States v. Wanning</u>, No. 4:03-CR-3001-1, slip op. at 6 (D. Neb. Feb. 3, 2005) ("The Guidelines and their ranges were explicitly crafted by the Sentencing Commission at the direction of Congress to implement the statutory purposes of sentencing").

As explained below, this case does not present the rare case in which the Guidelines (including the rules governing departures) fail to produce a sentencing range that fully accords with the various factors set forth in § 3553(a). Moreover, because the Court decided to depart downward at sentencing, it has already taken into account the extent to which the Guidelines failed to produce a sentence in accord with § 3553(a).

**B.      The PSR Properly Calculated the Defendant's Guidelines**
**Sentencing Range at 120 Months of Imprisonment**

In this case, it was undisputed that the defendants' adjusted offense level was 28 based on his two prior felony convictions for crimes of violence and/or controlled substance offenses, and the fact that he had possessed the ammunition at issue in connection with another felony offense, i.e., the distribution of narcotics.  It was also undisputed that, based on the number of criminal history points accumulated, the defendant fell within Criminal History Category VI.   Although there was a dispute as to whether the defendant should have received a two-level reduction for acceptance of responsibility, that reduction would not have reduced the guideline range below the 120 month statutory maximum incarceration term.   Therefore, the PSR properly calculated the defendant's guideline range as 120 months' incarceration.

As discussed above, the Court sentenced the defendant without regard to the mandatory guideline range.  Specifically, the Court ruled as follows:

> Mr. Snape, you earlier, a few moments ago, expressed your gratitude to Attorney O'Reilly. I think you are going to owe him a little more gratitude because he has persuaded me that I should depart.  He's right, that I'm not going to depart all that far but I am going to depart.

> I'm going to do so under 5K2.0 under a combination of factors, primarily my conclusion that the circumstances of your childhood, particularly your preteen years that you spent with your mother, were of such a nature that I have to assume they left you with certainly an emotional condition that affected the choices that you made in life and that because of that, and as I said, I didn't think it appropriate to depart on your criminal history but I also think the absence of any violence, there's a decent argument to be made that category six is a bit high for that type of criminal history.

> So those two factors together, particularly the what I'm going to call the Rivera factor, the Second Circuit case referring to the childhood abuse situation, justifies a departure on my part from the guideline range which, as I said, is effectively 120 months. . . .   It is the sentence of this Court that you be committed to the custody of the Bureau of Prisons for a term of 84 months. . . . .

> My hope is that I won't see you again but I can assure you, if you come out of prison, when

12

you do, and you continue to use drugs, I will see you. That gentleman or somebody sitting in that seat will bring to my attention your positive drug tests or your arrest for possession or whatever else it is. At that time, I'll impose further imprisonment upon you and I'll remember that I gave you a break, in effect, today and I can consider that when deciding how much more time.

In his October 24, 2005 sentencing memo, the defendant argues that the Court should impose a lower sentence now that the Sentencing Guidelines are no longer mandatory. In doing so, however, the defendant repeats the same arguments that he made in support of his departure request at sentencing. The Court has already considered these arguments, however, and, as a result, decided to impose a sentence that was 36 months below the guideline range. Whereas the defendant might have been in a better position to argue for a full re-sentencing had his request for a downward departure been denied, the fact that the Court granted the request and departed below the applicable guideline strongly suggests that the mandatory nature of the guidelines did not constrain the Court's sentencing decision.

The defendant also appears to base his request for re-sentencing on his post-sentencing rehabilitative efforts. This argument, however, is contrary to the Crosby decision. In Crosby, the Second Circuit concluded that "the 'further sentencing proceedings' generally appropriate for pre-Booker/Fanfan sentences pending on direct review will be a remand to the district court, not for the purpose of a required resentencing, but only for the more limited purpose of permitting the sentencing judge to determine whether to resentence, now fully informed of the new sentencing regime . . . ." Crosby, 397 F.3d at 117 (emphasis in original). The Second Circuit made clear that the district court was to consider "the circumstances existing at the time of the original sentence" in making its determination. See id. Indeed, the court explained, "If, based solely on the circumstances that existed at the time of the original sentence, the sentencing judge decides to resentence, the judge

will have to consider the issue of what current circumstances are to be considered . . . ." Id. at 118 n.19.

## III.    CONCLUSION

The offense of conviction in this case carried a maximum sentence of 120 months' incarceration, which was less than the 140-175 month incarceration range provided for by the applicable sentencing guidelines. The Court imposed a sentence of 84 months' incarceration after agreeing to depart from the effective 120 month guideline sentence. The critical inquiry at this junction is whether the Court would have imposed a nontrivially different sentence than the 84 months had it known that the sentencing guidelines were advisory, not mandatory.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

ROBERT M. SPECTOR
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT18082
450 MAIN STREET
HARTFORD, CT 06103
860-947-1101

## C E R T I F I C A T I O N

      This is to certify that on October 25, 2005 a true and correct copy of the foregoing was sent via regular mail to Mr. Francis L. O'Reilly, 87 Ruane Street, Fairfield, CT 06430; tel. (203) 319-0707, and to Brian Toper, United States Probation Officer, United States Probation Office, 450 Main Street, Hartford, CT; tel. (860) 240-3661.

ROBERT M. SPECTOR
ASSISTANT U.S. ATTORNEY